Hicks *v.* State.

4490                                            209 S. W. 2d 451

Opinion delivered March 22, 1948.

Rehearing denied April 12, 1948.

*K. T. Sutton,* for appellant.

*Guy E. Williams,* Attorney General and *Oscar E. Ellis,* Assistant Attorney General, for appellee.

HOLT, J. Two separate charges were preferred against appellant, a Negro woman. In one she was charged with operating a house of prostitution and in the other of being guilty of prostitution herself, in violation of §§ 1 and 2 of Act 240 of the Legislature of 1943. The causes were, by agreement, consolidated for trial and

she was found guilty by a jury on each charge. On the first, her punishment was fixed by the jury at 90 days in jail and a fine of $150, and on the second, at 30 days in jail and a. fine of $100. From the judgment directing that appellant be "confined in the county jail for a period of three months and thirty days and pay a fine of $250" is this appeal.

For reversal, appellant questions the sufficiency of the evidence and also contends that the verdicts were excessive and unreasonable.

There was no complaint as to any of the instructions.

The evidence offered by the State was to the following effect: L. D. Weaver, a deputy sheriff, in company with three other officers, went to appellant's home, and, quoting from his testimony: "Q. You had complaints about the place? A. Yes, sir. Q. What did you find, the four of you? A. We went to the house in which Jennie lives and Mr. Pounds and myself went to the front door and Mr. Webber and the other man went to the back door and when we went in the front door Jennie and a white man were in bed. Q. Were they undressed? A. Yes, sir, they were in their night clothes, the man had his shorts on. Q. Did she come to the door? A. Mr. Pounds went in first and I went in immediately behind him and when we went in she was in bed and there was another man in the back room in bed. Q. Did Mr. Pounds and the other Mr. Weaver come in? A. Yes, sir. . . . Q. She was arrested at that time. A. Yes, sir. Q. During the time you have been on the police force and have been on the sheriff's force, have you observed the place where she lived? A. Yes, sir. Q. What have you observed with reference to white or colored people frequenting the place? A. Every time I have been over there there were white men there, but I never saw a colored man there. Q. Were there other Negro women there? A. Yes, sir. Q. How big a house does she have? A. A four-room house, I think. . . . Q. Have you ever made other arrests there? A. Yes, sir, I have had occasion to get calls that something happened, they were in fights or something like that and I would find them there.

Q. On approximately how many occasions have you seen Negro women and white men frequenting the place there? A. In the last year, seven or eight times. . . . Q. After she was arrested on this charge and made bond, did you have occasion to go back over there? A. Yes, sir, I went over there with her attorney. Q. What did you find on that occasion? A. There was a white man in bed and she was sitting by the bed. Q. Did they have anything to drink then? A. There was a partial bottle of beer gone and while Mr. Sutton and I were there Amanda came in with a sack of beer. . . . Q. On other occasions that you have been to her house did you observe whiskey and beer being consumed? A. Yes, sir. Q. In large or small quantities? A. I would say large quantities, there were several large bottles there."

The officers who accompanied Weaver corroborated his testimony.

E. P. Hickey testified: "Q. You say you have seen white men and white women there in bed? A. Yes, sir. . . . Q. That was last year? A. Yes, sir. Q. How many times did you catch white men and women there? A. I never did go there to make a specific investigation as to her operating a house of prostitution, I would go over there looking for somebody involved in other crimes. Q. The other officers said they never had seen colored women there, you say you saw some there? A. Yes, sir. Q. When was that? A. It might have been last year or the year before, this investigation was brought about by complaints from white men."

Appellant denied her guilt. However, the jury's verdicts finding her guilty reflect that they accepted as true the testimony offered by the prosecution, and this testimony, if believed, abundantly sustained these verdicts. The above testimony speaks for itself and needs no comment.

Appellant's further contention that the punishment was excessive and unreasonable and in violation of the constitutional provision which prohibits "excessive fines" or "cruel or unusual punishment," (Art. 2, § 9, Constitution of Arkansas) is untenable. The punish-

ment fixed by section one of the statute, *supra,* under which appellant was convicted, fixes the punishment at not less than three months nor more than six months in the county jail and a fine of not less than $100 nor more than $250, and the punishment on the second charge under section two was fixed at not less than thirty days nor more than three months in jail and a fine of not less than $50 nor more than $100. The punishment inflicted on each charge was therefore not in excess of the statutory provisions, in fact, it was less. It was obviously the Legislature's intent to afford the jury some discretion in fixing punishment in cases of this nature.

In the case of *Daugherty* v. *State,* 130 Ark. 333, 197 S. W. 576, wherein it was argued that punishment of 10 years in the penitentiary for the larceny of a horse and buggy was "cruel and excessive," this court said: "The statute authorizes the punishment thus adjudged, and the verdict did not exceed the maximum penalty prescribed by the statute for the larceny of a horse. Therefore, no unusual, cruel or excessive punishment was imposed. See *In re Wm. W. Taylor,* 7 S. Dak. 382, 64 N. W. 253, 45 L. R. A. 136, and note, 58 Am. St. Rep. 843."

In *Ex parte Brady,* 70 Ark. 376, 68 S. W. 34, this court held: (Headnote 4). "Constitutional Law—Cruel and Unusual Punishment.—The fact that a defendant was fined sums aggregating $3,200, with costs aggregating $800, in 20 prosecutions for unlawfully selling liquors, and that, if compelled to serve out his fines under contractors and in jail, it will be about 12 years before he can be released, does not establish that the punishment is cruel and unusual, within the prohibition of Constitution 1874, art. 2, § 9."

Finding no error, the judgment is affirmed.